UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| DAVID DUBROW, Individually and On Behalf of All Others Similarly Situated, ) ) ) ) | 04  10096 JLT |
| Plaintiff, ) ) | |
| vs. ) ) ) | CLASS ACTION COMPLAINT FOR VIOLATIONS OF FEDERAL SECURITIES LAWS |
| NETWORK ENGINES INC., JOHN CURTIS, DOUGLAS G. BRYANT and LAWRENCE A. GENOVESI, ) ) ) ) | **JURY TRIAL DEMANDED** |
| Defendants. ) ) | |

MAGISTRATE JUDGE

## CLASS ACTION COMPLAINT

Plaintiff has alleged the following based upon the investigation of plaintiff's counsel, which included a review of United States Securities and Exchange Commission ("SEC") filings by Network Engines, Inc. ("Network Engines" or the "Company"), as well as regulatory filings and reports, securities analysts' reports and advisories about the Company, press releases and other public statements issued by the Company, and media reports about the Company, and plaintiff believes that substantial additional evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## NATURE OF THE ACTION

1. This is a federal securities class action on behalf of all purchasers or entities who purchased the securities of Network Engines between November 6, 2003 and December 10, 2003, inclusive, and who were damaged thereby (the "Class"). Plaintiff seeks to pursue remedies under the Securities Exchange Act of 1934 (the "Exchange Act").

## JURISDICTION AND VENUE

2. The claims asserted herein arise under and pursuant to Sections 10(b) and 20(a) of the Exchange Act [15 U.S.C. §§ 78j(b) and 78t(a)] and Rule 10b-5 promulgated thereunder by the Securities and Exchange Commission ("SEC") [17 C.F.R. § 240.10b-5].

3. This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1337 and Section 27 of the Exchange Act [15 U.S.C. § 78aa].

4. Venue is proper in this District pursuant to Section 27 of the Exchange Act, and 28 U.S.C. § 1391(b), as many of the acts and practices complained of herein occurred in substantial part in this District.

5. In connection with the wrongs alleged herein, defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the mails, interstate telephone communications and the facilities of the national securities markets.

## PARTIES

6. Plaintiff David Dubrow, as set forth in the accompanying certification, incorporated by reference herein, purchased the securities of Network Engines at artificially inflated prices during the Class Period and has been damaged thereby.

7. Defendant Network Engines is a Delaware corporation with its principal place of business located at 25 Dan Road, Canton, MA 02021. The Company is a provider of server appliance hardware and custom integration services. Network Engines is focused on partnering with independent software vendors ("ISVs") and original equipment manufacturers ("OEMs") to provide these strategic partners with server appliance hardware, integration services and

appliance development, deployment and support to allow these strategic partners to deliver turnkey solutions to their end user customers.

8.     At all times relevant to this action, Defendant John Curtis ("Curtis"), was the Company's President and Chief Executive Officer.

9.     At all times relevant to this Complaint, Defendant Douglas G. Bryant ("Bryant") was the Company's Chief Financial Officer ("CFO") and Vice President of Finance and Administration.

10.     At all times relevant to this Complaint, Defendant Lawrence A. Genovesi ("Genovesi") was a founder of Network Engines and the Chairman of its Board of Directors. He also previously served as the Company's President, Chief Executive Officer and Chief Technology Officer.

11.     Defendants Curtis, Bryant and Genovesi are collectively referred to herein as the "Individual Defendants."

12.     As a result of the Individual Defendants' positions with Network Engines, they had access to the adverse undisclosed information about the Company's business, operations, operational trends, financial statements, markets and present and future business prospects via access to internal corporate documents (including, inter alia, the Company's operating plans, budgets and forecasts and reports of actual operations compared thereto), conversations and connections with other corporate officers and employees, attendance at management and Board of Directors meetings and committees thereof and via reports and other information provided to them in connection therewith.

3

13.     It is appropriate to treat the Individual Defendants as a group for pleading purposes and to presume that the false, misleading and incomplete information conveyed in the Company's public filings, press releases and other publications as alleged herein are the collective actions of the narrowly defined group of defendants identified above. Each of the above officers of Network Engines, by virtue of their high-level positions with the Company, directly participated in the management of the Company, was directly involved in the day-to-day operations of the Company at the highest levels and was privy to confidential proprietary information concerning the Network Engines and its business, operations, growth, financial statements, and financial condition, as alleged herein. Said defendants were involved in drafting, producing, reviewing and/or disseminating the false and misleading statements and information alleged herein, were aware, or recklessly disregarded, that the false and misleading statements were being issued regarding the Company, and approved or ratified these statements, in violation of the federal securities laws.

14.     As officers and controlling persons of a publicly-held company whose common stock was, and is, registered with the SEC pursuant to the Exchange Act, and was traded on the NASDAQ National Market ("NASDAQ"), and governed by the provisions of the federal securities laws, the Individual Defendants each had a duty to disseminate promptly, accurate and truthful information with respect to the Company's financial condition and performance, growth, operations, financial statements, business, markets, management, earnings and present and future business prospects, and to correct any previously-issued statements that had become materially misleading or untrue, so that the market price of the Company's publicly-traded securities would

be based upon truthful and accurate information. The Individual Defendants' misrepresentations and omissions during the Class Period violated these specific requirements and obligations.

15. The Individual Defendants participated in the drafting, preparation, and/or approval of the various public and shareholder and investor reports and other communications complained of herein and were aware of, or recklessly disregarded, the misstatements contained therein and omissions therefrom, and were aware of their materially false and misleading nature. Because of their Board membership and/or executive and managerial positions with Network Engines, each of the Individual Defendants had access to the adverse undisclosed information about Network Engines business prospects and financial condition and performance as particularized herein and knew (or recklessly disregarded) that these adverse facts rendered the positive representations made by or about Network Engines and its business issued or adopted by the Company materially false and misleading.

16. The Individual Defendants, because of their positions of control and authority as officers and/or directors of Network Engines, were able to and did control the content of the various SEC filings, press releases and other public statements pertaining to the Company during the Class Period. Each Individual Defendant was provided with copies of the documents alleged herein to be misleading prior to or shortly after their issuance and/or had the ability and/or opportunity to prevent their issuance or cause them to be corrected. Accordingly, each of the Individual Defendants bears responsiblity for the accuracy of the public reports and releases detailed herein and is therefore primarily liable for the representations contained therein.

17. Each of the defendants is liable as a participant in a fraudulent scheme and course of business that operated as a fraud or deceit on purchasers of Network Engines securities by

disseminating materially false and misleading statements and/or concealing material adverse facts. The scheme: (i) deceived the investing public regarding the Company's business, operations, management and the intrinsic value of Network Engines securities; (ii) enabled defendant Genovesi to sell 75,000 shares of his personally-held stock at artificially inflated prices for gross proceeds of $783,300, and (iii) caused plaintiff and other members of the Class to purchase Network Engines securities at artificially inflated prices.

## PLAINTIFF'S CLASS ACTION ALLEGATIONS

18.  Plaintiff brings this action as a class action pursuant to Rule 23(a) and (b)(3) of the Federal Rules of Civil Procedure, on behalf of a Class consisting of all those who purchased or otherwise acquired the securities of Network Engines between November 6, 2003 and December 10, 2003, inclusive (the "Class Period") and who were damaged thereby. Excluded from the Class are defendants, the officers and directors of Network Engines, members of their immediate families and their legal representatives, heirs, successors or assigns and any entity in which defendants have or had a controlling interest.

19.  The members of the Class are so numerous that joinder of all members is impracticable. As of July 31, 2003, there were 34,254,308 shares of Network Engines' common stock outstanding. Throughout the Class Period, Network Engines common shares were actively traded on the NASDAQ. While the exact number of Class members is unknown to plaintiff at this time and can only be ascertained through appropriate discovery, plaintiff believes that there are hundreds or thousands of members in the proposed Class. Record owners and other members of the Class may be identified from records maintained by Network Engines or its transfer agent

and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

20. Plaintiff's claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by defendants' wrongful conduct in violation of federal law that is complained of herein.

21. Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class and securities litigation.

22. Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class. Among the questions of law and fact common to the Class are:

(a) whether the federal securities laws were violated by defendants' acts as alleged herein;

(b) whether statements made by defendants to the investing public during the Class Period misrepresented material facts about the business, operations and management of Network Engines; and

(c) to what extent the members of the Class have sustained damages and the proper measure of damages.

23. A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable. Furthermore, as

the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them. There will be no difficulty in the management of this action as a class action.

## SUBSTANTIVE ALLEGATIONS

24.     Network Engines is a provider of server appliance hardware and custom integration services. The Company is focused on partnering with independent software vendors (ISVs) and original equipment manufacturers (OEMs) to provide these strategic partners with server appliance hardware, integration services and appliance development, deployment and support to allow these strategic partners to deliver turnkey solutions to their end user customers.

25.     Network Engines became a public company in July 2000 and, shortly thereafter, suffered a decline in a substantial portion of its business with the bursting of the internet bubble. In late 2001, Network Engines entered into a successful manufacturing deal with EMC Corporation ("EMC") to build its Centera product, a contract that would soon account for half of the Company's revenue. Centera was designed for storing fixed content, such as medical records and e-mail messages, and was introduced just as health care and securities regulations began to increase, igniting strong demand for such a data storage platform.

26.     Then, in November 2002, Network Engines acquired TidalWire, Inc. ("TidalWire"), which enabled it to expand into the distribution business. TidalWire is a specialist in the distribution and support for storage networking and has had significant traction distributing Host Bus Adapters ("HBAs"). HBAs are cards that connect data storage systems to

8

computer networks. With the acquisition of TidalWire, Network Engines was able to expand the scope of its relationship with EMC by distributing HBAs to EMC.

27. By the beginning of the Class Period, defendants knew, but failed to disclose, that Network Engines was in the process of renegotiating its distribution contract with EMC, and that EMC was demanding price reductions, which, if agreed to, would negatively impact the Company's future financial results. Nevertheless, throughout the Class Period, defendants issued statements highlighting the Company's strong financial performance, continued growth and the success of its relationship with EMC, its largest customer. Defendants failed to disclose, however: (i) that the Company was in the process of renegotiating its distribution contract with EMC; (ii) that EMC was demanding price concessions to bring its agreement with Network Engines in line with the pricing that Network Engines was providing to other customers; (iii) that the new distribution contract with EMC would negatively impact the Company's future financial performance; (iv) that the Company would not be able to sustain the growth in its gross margins as a result of the amended contract; and (v) as a result, the Company's positive statements issued during the Class Period were materially false and misleading when made.

28. On December 10, 2003, the Company announced, <u>inter alia,</u> that it had renegotiated its distribution contract with EMC and the renegotiated contract would negatively impact the Company's gross profit related to the sale of EMC-approved HBAs and the Company's distribution operations gross profit.

29. Following this announcement, shares of Network Engines common stock fell $3.92 per share, or 39%, to close at $6.10 per share, on extraordinarily high trading volume, and have continued to decline since that time.

## Materially False and Misleading
## Statements Made During the Class Period

30. The Class Period begins on November 6, 2003. On that date, the Company issued a press release announcing its financial results for the fourth quarter and full year of fiscal 2003. Defendant Curtis commented on the Company's "solid" performance, stating, in pertinent part, as follows:

> The results for our fiscal year 2003 reflect a dramatic turnaround for Network Engines. Our results reflect the continuing success of our business strategy. We are seeing increasing acceptance of our unique value proposition by our customers and software partners. We recently announced new application partners, including KVS, Inc., Computer Associates International, Inc. and CommVault Systems, Inc., that we will work with to develop and distribute server appliances into our customer base of over 400 channel customers in the growing storage and security networking markets. [Emphasis added.]

The press release also commented on the Company's relationship with its current customer base, stating, in part, as follows:

> Additionally, the Company continued to develop its relationships with new partners and strengthen relationships with existing partners. [Emphasis added.]

31. In a conference call with investors later that same day, defendants Curtis and Bryant discussed the Company's performance and, towards the end of the call, responded to a series of questions by the participants on the call. Defendant Curtis began the call and spoke positively about the Company's positioning for future growth and the success of the Company's acquisition of TidalWire. Specifically, defendant Curtis stated, in pertinent part, as follows:

> As we have said previously, we believe that there is a trend towards the convergence of storage and security applications and we believe that we have positioned the company to address the growing demand for network appliance solutions in these markets.

10

> We consider our acquisition of TidalWire to be a core success for our company. In our Q4, we benefited from the surge in demand for storage networking products distributed by our TidalWire distribution operation. [Emphasis added.]

Defendant Curtis continued to comment positively on the future opportunities for the Company, stating, in pertinent part, as follows:

> Furthermore, we are optimistic that in coming quarters, there will be more opportunities to partner with existing and the newly signed software companies to develop, market and distribute new appliances into the storage and security markets. [Emphasis added.]

Defendant Curtis further commented on the success of TidalWire, stating, in pertinent part, as follows:

> We have added a highly qualified distribution sales, marketing and logistics team from TidalWire, along with their state-of-the-art CRM and logistic systems and equally important, a channel of other value-added resalers, resellers and systems integrators.

32. Additionally, defendant Bryant made positive statements about Network Engines' performance and its future outlook. Concerning the Company's gross margins, defendant Bryant stated that

> Gross margins for the fiscal year were 20.6% compared to 14.2% in fiscal 2002. During fiscal 2003, the distribution business contributed 19.8% gross margin, while the OEM appliance business contributed 21.3% gross margins.
>
> The entire 14.2% gross margins from fiscal 2002 were generated exclusively by our OEM appliance business as we had not yet acquired TidalWire, which occurred at the end of the first fiscal quarter of 2003. [Emphasis added.]

With regard to the dramatic decrease in the Company's net loss, defendant Bryant stated:

> This improvement is directly related to the growth of our revenues which was driven by our acquisition of TidalWire and the growth in our OEM appliance business, while maintaining control over our operating expenses. [Emphasis added.]